## STEVENSON v. WILLIAMS.

1. The act of Congress of March 2d, 1867, under which a removal may be had of causes from a State to a Federal court, only authorizes a removal where an application is made before final judgment in the court of original jurisdiction, where the suit is brought. It does not authorize a removal after an appeal has been taken from such judgment of the court of original jurisdiction to the Supreme Court of the State.

2. Where the judgment of a State court was annulled by the decree of a court of the same State, on the ground that the notes on which the judgment was rendered were given for a loan of Confederate money, and that the transactions which resulted in the acquisition of the notes were had between enemies during the late civil war, in violation of the proclamation of the President forbidding commercial intercourse with the enemy, this court cannot review the ruling in these particulars. It conflicts with no part of the Constitution, laws, or treaties of the United States, and presents no Federal question.

ERROR to the Supreme Court of Louisiana.

Alfred Williams, of Louisiana, a person with no property, married in 1842 Catharine Stewart, the possessor of a large estate there. Three children were the fruit of the marriage. The wife died in 1854; the husband in 1863. During Mrs. Williams's life her husband managed her property. There was no marriage settlement; and the community of acquests and gains which existed among them under the Louisiana Code, though terminating with the wife's death, was never settled by the husband.

By the death of his wife, Williams became, by operation of the Code, the natural guardian or tutor of his minor children. He died without having rendered any account of his administration as such.

Prior to the 21st March, 1862, a certain Stevenson, resident in Nashville, Tennessee, then within the Union lines, sent to his agent in New Orleans, which at the time and till about the end of April, 1862, was in the rebel lines, a quantity of checks on banks, drafts, and some Confederate notes to invest for him. The agent deposited all to his own credit in a bank, which collected the drafts and checks, and afterwards, March 21st, 1862, he bought from indorsers of them, who had them, twelve notes of Williams for $5000 each, in all $60,000, giving a check for them on the bank of New Orleans, which check was paid in Confederate money; the only currency of New Orleans at that time. The notes themselves the agent sent to Stevenson. The notes, which had one, two, and three years to run, not being paid, Stevenson sent them to New Orleans to be collected by suit, and suit was brought on them prior to November 28th, 1863. On that day, a computation being made, $79,800 was found due on them. An arrangement was made, however, by which it was agreed $3000 should be paid in cash, with an understanding that $65,000 should be payable in two, three, four, five, and six years, with interest in full of the balance claimed.

On the 21st December, 1865, judgment was entered up in favor of Stevenson, *with privilege upon the whole succession,* movable and immovable. Stevenson's claim was thus put upon the same footing as funeral charges and other privileged debts.

On the 21st March, 1867, the children of Mr. and Mrs. Williams brought suit to annul the judgment thus rendered in favor of Stevenson. They alleged their father's debt to them for his management of the community of acquests and gains, for which debt they asserted that they had a legal privilege on all his property over all other creditors. They further alleged that Stevenson, residing at Nashville, then

within the Federal lines, sent to New Orleans, when the city was in the possession of the insurgents, to an agent of his there, a quantity of Confederate notes—" notes issued by a government, ' so called,' the Confederate States of America, . . . who had combined to dissolve the Union,"— and that this agent had lent $60,000 of such notes to the decedent, Williams, their father; that such loan was illegal and void, because the notes were an instrument of treason. They accordingly prayed that Stevenson's judgment be declared void. Stevenson filed his answer; and on the 22d March, 1869, the case was submitted to the Second District Court of New Orleans. By its decree the judgment of Stevenson was annulled, and the judicial mortgage resulting from the recording of it ordered to be cancelled. The grounds on which the judgment was annulled were :

1st. That the notes on which the judgment was rendered were given for a loan of Confederate money; and,

2d. That the transactions between Williams and Stevenson were had while one resided within the Federal and the other within the Confederate lines.

The court, in giving its decision, said :

" It is clear from the testimony that the consideration [of the notes] was Confederate money. Article 127, constitution of 1868, prohibits the courts of this State from enforcing such agreements as this is found to be.

" On the remaining ground it is clearly established that Williams was a citizen of this State, and that Stevenson had for a long time been a citizen of Nashville, Tennessee. Nashville was taken by the Federal forces on the 23d of February, 1862, and it remained under their domination until the close of the war. New Orleans was under Confederate rule until its fall, on the 25th of April, 1862, and between these dates, on the 21st March, 1862, Stevenson sent his Confederate currency to Williams, in New Orleans, for which he gave his notes.

" This transaction was not only in violation of the laws of war, but in disobedience of the President's proclamation, in conformity with an act of Congress."

Stevenson applied for a new trial, which was refused on

11th June, 1869, and he then appealed to the Supreme Court of Louisiana.

While the case was pending on appeal he filed a petition, professedly under the act of March 2d, 1867,* for the remova. of the record of appeal from the Supreme Court of Louisiana to the Circuit Court of the United States for the Circuit and District of Louisiana.  The act under which the petitioner sought to remove the case enacts that—

"Where a suit is brought in any State court in which there is controversy between a citizen of the State in which the suit is brought and a citizen of another State, &c., such citizen of another State, whether he be plaintiff or defendant, &c., may *at any time before the final hearing or trial of the suit*, file a petition for removal," &c., and that when the papers get to the Circuit Court of the United States, " the suit shall there proceed in the same manner as if it had been brought there by original process."

The petition for removal was refused, and the judgment of the District Court was affirmed.   From this judgment of affirmance by the Supreme Court of Louisiana the case was brought here, as within the twenty-fifth section of the Judiciary Act.

*Messrs. J. A. and D. G. Campbell, for the plaintiff in error; Messrs. Durant and Horner, contra.*

Mr. Justice FIELD delivered the opinion of the court.

The application of the appellant for the removal of the suit from the Supreme Court of Louisiana to the Circuit Court of the United States was made too late, and was properly refused on that ground.  The act of Congress of March 2d, 1867,† under which the removal was asked, only authorizes a removal where an application is made " before the final hearing or trial of the suit," and this clearly means before final judgment in the court of original jurisdiction, where the suit is brought.   Whether it does not mean still

---

* 14 Stat. at Large, 558.                    † Ib.

more—before the hearing or trial of the suit has commenced which is followed by such judgment—may be questioned; but it is unnecessary to determine that question in this case.

After a final judgment has been rendered in the State court, the case cannot be removed to the Circuit Court of the United States, and "there proceed," as the statute provides, "in the same manner as if brought there by original process," without setting aside the trial and judgment of the State court as of no validity. No such proceeding is contemplated by the act; and since the decision of *The Justices* v. *Murray*, reported in 9th Wallace, legislation directed to that end, where, at least, the trial has been by jury, would be of doubtful validity.

The judgment recovered by Stevenson against the succession of Williams, appears to have been annulled on two grounds: 1st, that the notes on which the judgment was rendered were given for a loan of Confederate money; and 2d, that the transactions which resulted in the acquisition of the notes were had between enemies during the late civil war, in violation of the proclamation of the President forbidding commercial intercourse with the enemy.

The first ground would not be deemed, in a Federal court, sufficient to set aside a judgment rendered for the cash value, in National currency, of the Confederate money, especially when, as in this case, the judgment was entered upon a stipulation with the executor of the estate for an extended credit. And the evidence in the record leads us to doubt whether the transactions detailed properly fall within the rule of public law, or the proclamation of the President, forbidding commercial intercourse with the enemy.

But the ruling of the State court in these particulars, however erroneous, is not the subject of review by us. It presents no Federal question for our examination. It conflicts with no part of the Constitution, laws, or treaties of the United States.

Had the State court refused to uphold the judgment because of the provision in the constitution of the State, sub-

sequently adopted, prohibiting the enforcement of contracts founded upon Confederate money, a Federal question would have been presented. That provision, however, although referred to, does not appear to have caused the ruling. The court only followed its previous adjudications, that contracts of the character mentioned were invalid.*

JUDGMENT AFFIRMED.

---

* West Tennessee Bank *v.* Citizens' Bank, 13 Wallace, 432; Bethell *v.* Demaret, 10 Id. 537.